In the Matter of the Judicial Settlement of the Accounts of J. SPENCER HOSFORD and EDWARD P. VAN ALSTYNE, as Executors, etc., of BARENT VAN ALSTYNE, Deceased.

HENRY SNYDER and Others, and CALVIN ACKLEY, as Executor, etc., of THEODORE SNYDER, Deceased, Appellants; J. SPENCER HOSFORD and EDWARD P. VAN ALSTYNE, as Executors, etc., of BARENT VAN ALSTYNE, Deceased, Respondents.

*Equitable conversion — an honest mistake of executors — a delay in the exercise of a power of sale — payments made upon a bond and mortgage to protect land which the testator had contracted to sell — failure to collect notes — proof as to attorney's bill and other expenses of administration — an allowance, for services as to real estate, refused.*

A clause contained in a will by which the testator provides, "All the rest, residue and remainder of my personal and proceeds of my real property, not hereinbefore devised, I give, devise and bequeath to my nephews and nieces living at the time of my decease, to be divided amongst them, share and share alike,

hereby giving and granting full power and authority to my said executors to sell and dispose of all such real estate either at public or private sale, and at such time or times as they shall judge expedient," works an equitable conversion of the land into personal property.

Executors who, in good faith and with an honest intent to act for the benefit of the estate committed to their charge, defer the sale of the real estate, the market value of which at the time of their appointment is depreciated, in consequence of which delay a loss results to the estate, by reason of its further depreciation in value, are not chargeable with such loss, the mistake being one that might well have been made by the 'wisest business man; and they should be allowed for taxes and expenses of management paid and incurred during the time they held the property.

Payments made by executors in good faith upon a bond and mortgage not given by their testator, but which was a lien upon lands which he had contracted to sell at a price in excess of such lien to a third person, should be allowed them upon their accounting where it appears that they had reason to believe that the vendee would carry out his contract, although he, in fact, subsequently surrendered it and the payments were lost to the estate.

Executors may properly be allowed for losses on promissory notes belonging to the estate, where the proof shows that they had by the exercise of some diligence collected a portion of the notes, and it appears probable that the notes could not have been collected if any other method of collection than that employed by the executors had been adopted.

Executors are chargeable with the amount of a large note of a debtor of the estate which they have not attempted to collect by legal proceedings, although the debtor has had, during several years of their executorship, a large amount of personal property in his possession and under his control, subject to levy upon execution, out of which a judgment on the note in question could apparently have been collected; nor are they excused by the fact that they acted in the matter under the advice of their attorney, as they are bound to exercise active vigilance in the collection of the assets. MERWIN, J., dissented.

The burden of proving a claim, made by an executor, to be allowed for counsel fees or other expenses of administration rests upon the executor.

A bill rendered by an attorney to executors should either be itemized or the executors, upon their accounting, should prove the particular services which he rendered them.

A surrogate cannot make an allowance to executors for their services in regard to the real estate of the testator, where the services were rendered by them in the discharge of their duties as executors.

APPEAL by Henry Snyder and others, and Calvin Ackley, as executor, etc., of Theodore Snyder, deceased, legatees named in the last will and testament of Barent Van Alstyne, deceased, from a decree of the Surrogate's Court of the county of Columbia, entered in said Surrogate's Court on the 31st day of December, 1896, settling the

accounts of J. Spencer Hosford and Edward P. Van Alstyne, as executors, etc., of Barent Van Alstyne, deceased, except from so much thereof as allows counsel fees and expenses to the referee and the respective attorneys.

The will of Barent Van Alstyne, deceased, was admitted to probate by the surrogate of Columbia county on the 28th day of May, 1896, and letters testamentary were at the same time issued to J. Spencer Hosford and Edward P. Van Alstyne, the executors named in said will.

This is an appeal from the decree of the surrogate of said county, entered on the 31st day of December, 1896, in the matter of the final accounting of the said executors. The issues raised on the accounting were referred to a referee, and, on the coming in of his report, the final decree was entered. Henry Snyder, Isaac V. A. Snyder and other legatees named in the will of said deceased, claiming that certain credits on the account of said executors were improperly allowed by the surrogate, have appealed to this court.

*J. Newton Fiero* and *G. S. Collier*, for the appellants.

*John Cadman*, for the respondents.

PUTNAM, J.:

It is urged by the appellants that the said executors, failing to dispose of the real estate left by said testator within a reasonable time after the issuing of letters testamentary, should be charged, not only with the losses on such sales, but also with the expenses incurred by them with regard to such real estate, after the lapse of a reasonable time from the death of the testator.

The 4th clause of the testator's will was as follows: " All the rest, residue and remainder of my personal and proceeds of my real property, not hereinbefore devised, I give, devise and bequeath to my nephews and nieces living at the time of my decease, to be divided amongst them, share and share alike, hereby giving and granting full power and authority to my said executors to sell and dispose of all such real estate, either at public or private sale, and at such time or times as they shall judge expedient, and to execute and deliver such deed or deeds as shall be necessary to complete the sale or sales of such real estate for the purpose of such division."

The effect of this clause was to work an equitable conversion of the land. The whole estate is to be regarded as if personal property under the charge and control of the executors, for the purpose of carrying out the provisions of the will. And it will be observed that the executors, by the express language of the will, were given power to sell the real estate " at such time or times as they shall judge expedient."

It is a fact that there was a great delay in disposing of the real estate. It is probable that such delay resulted in a loss to the estate; that in failing to promptly dispose of the lands left by the testator the executors made a mistake. But we see no reason to doubt that they acted in good faith. One of them was a legatee, and the other the husband of a legatee, and, therefore, they were interested in disposing of the property to the best advantage. At the time of their appointment the value of the real estate was depreciated. Whether they should then sell or wait until real estate might increase in value was a question on which the most astute business man might make a mistake. If the value of land had subsequently appreciated, and in consequence of their delay a benefit had resulted to the estate, the wisdom and propriety of their course would not have been doubted. Because the contrary result ensued, in consequence of the executors taking a course that any good business man might have adopted as to his own real estate, we do not think they should be held responsible. As held in the opinion *In the Matter*, etc., *of Estate of Weston* (91 N. Y. 502–510): "There is, and there can be, no rigid and arbitrary standard by which to measure the reasonable time within which the discretion of an executor directed to convert an estate into money must operate." The opinion, after citing authorities, further states: "The better opinion derived from them would seem to be that each case must stand upon its own facts; that what would be a reasonable time in one instance might not be in another."

As above suggested, this real estate, under the provisions of the will, should be regarded as if personal property. The executors were charged with the duty of disposing of it for the benefit of creditors and legatees. If the executors, acting in good faith, and undoubtedly with an honest intent to thus act for the benefit of the estate committed to their charge, made the same mistake that the

wisest business man might have made in delaying the sale of the real estate, they should not be charged with a loss resulting therefrom. And for the same reason the executors were entitled to be allowed for the taxes paid on, and the necessary expenses incurred in the management of, the said real estate while under their control.

We agree with the views stated in the opinion of the learned referee, in regard to the subject above considered, and in addition to what he has said, deem any further discussion unnecessary.

The contestants claim that the accountants should have been charged with the principal and interest paid to David Strain on his mortgage on the land known as the "Cozzens Farm." This mortgage was not made by Barent Van Alstyne, and his estate was not liable therefor. The farm was owned by the testator at the time of his death. He had contracted to sell the same to one John Cozzens for the sum of $5,800; it was subject to a mortgage held by David Strain. This was the situation when the farm came under the control of said accountants. Cozzens paid the interest on the contract for several years, and while he was so occupying under the contract, and making payments thereunder, the executors paid $1,285.71 of the principal of the mortgage held by said Strain and interest thereon, amounting in all to over $2,000. Under all the circumstances of the case, we are inclined to agree with the conclusion reached by the referee that, for the purpose of protecting land which the deceased had contracted to sell and carrying out his contract, and having reason to believe that Cozzens would fulfill his covenants contained in said contract, and thus the estate be benefited, the executors might lawfully make payment on the prior mortgage, although afterwards Cozzens surrendered the contract, and the amount thus paid was lost to the estate, as well as the farm itself. The facts considered in the case of *Matter of Gray* (27 Hun, 455), to which we are referred by the learned counsel for the appellants, were different from those appearing in this case. The executors here found the land under a contract made by the deceased. Undoubtedly they believed the contract would be fulfilled by Cozzens. Acting in good faith, and with a view of performing the agreement of their testator, they made the payments in question, and we think that the allowance therefor, under the circumstances, was proper.

The payment of $515 made to William H. Rainey, executor, etc., by said accountants, and for which they were allowed by the surrogate, to which allowance the contestants made the same objection, was repaid to the estate of Edward P. Van Alstyne, and hence was properly allowed.

The respondents were allowed in the accounting for the loss of $2,835.31 on three notes made by John Raeder, which were inventoried at $8,141.37. This allowance is objected to on the ground of the alleged negligence of the executors in collecting said notes. It was shown that Raeder transferred to the executors the "Fox Meadow" farm to apply on said indebtedness, and that from that farm and other sources they realized the sum of $5,313.76, which was applied on said notes, leaving $2,835.31 thereon unpaid, and a loss to the estate. We do not deem it necessary to recapitulate the evidence bearing on this branch of the case. It is discussed at length in the opinion of the learned referee, and we are inclined, although with some hesitation, to concur in his views therein stated.

The executors succeeded in collecting a portion of the amount of the notes, and appear to have acted with some diligence in the matter. J. Spencer Hosford testified as follows: "I inquired of Mr. Rainey if John Raeder had any property aside from this Fox Meadow farm which was available, and also took advice of our counsel who knew pretty well how John Raeder stood. Raeder lived in the town of Kinderhook and I knew pretty well about his circumstances. I talked with him and he told us he had nothing to give us; talked with others about it and took the advice of counsel and followed the advice of counsel in regard to the whole transaction. Did not at that time and do not now know of any other way by which we could get any more money on the estate for these Raeder notes than what we got in the way pursued." We think, under the evidence, that the court below was not compelled to charge the respondents with the amount of the loss on said notes.

Among other expenses the executors charged the estate with the sum of $4,657.31 paid to their attorney W. H. Atwood, and also the further sum of $1,954.25 paid to their counsel. The contestants urge that an item of $2,000 and one of $500 paid by the executors to said Atwood, embraced in said bill of $4,857.31, should have been disallowed on said accounting; that Atwood furnished the executors

with no bill of items showing for what services the $2,500 was charged, and none was produced on the trial; nor was it shown by any evidence for what special services the $2,500 was charged; or that services of that value had been performed, or that said services were necessary.

On the final accounting before a surrogate, an unassailed voucher for the payment of a debt of the deceased throws upon a contestant the burden of impeaching the justice, as well as the fact of the payment of the claim. The burden of proving a claim made by an accountant, to be allowed for counsel fees or other expenses, rests upon him. It, therefore, devolved upon the respondents to show the justice of the bill of Atwood, for which they claim to be allowed. They were compelled to show what the services were; that they were necessary, and of the value charged. (See *Journault* v. *Ferris*, 2 Dem. 320; *Willson* v. *Willson*, Id. 462; *St. John* v. *M'Kee*, Id. 236; *Raymond* v. *Dayton*, 4 id. 333; *In re Casey's Estate*, 6 N. Y. Supp. 608.) We think the charges in the bill of Atwood for the amount of the taxed bills of costs in the several actions to foreclose mortgages were sufficiently proved on the accounting, but have entertained some doubt as to whether the propriety and necessity of the payment of the two items of $2,000 and $500 on such bill, especially objected to by the contestants, was sufficiently shown. There should have been a bill of items furnished, or the particular services rendered should have been proved. It should have appeared that the $2,500 in question was charged for necessary services performed for the executor, and were of the value charged.

But it was shown that Atwood was employed by the executors in many litigations; that he acted for them for the period of six years, and that for a considerable part of that time he held daily and lengthy consultations with them, and that he finally presented his bill. The executors objected to the amount; he made some reduction, and the last payment of $500 charged on the account was made on such settlement of his bill as rendered. The final payment was, therefore, made on an accounting and settlement between the parties as to services rendered by Atwood during the period of six years. While, as above suggested, the evidence pro-

duced by the executors to establish the claim to be allowed for such payment to Mr. Atwood is not entirely satisfactory, we are inclined to think it sufficient to sustain the conclusion reached by the referee.

The executors were charged in the inventory with a note of Mary A. Wild and Charles Wild, dated January 19, 1882, for $11,000, and interest from January 19, 1884, $1,567.50; total amount as on the inventory, $12,567.50. On the accounting they were credited with that sum as a loss.

The executors, finding among the estate of the deceased this note for so large a sum, were bound to act with vigilance for its collection. (*Harrington* v. *Keteltas et al.*, 92 N. Y. 40.) And on the accounting the onus was upon them to show a fair reason why they did not commence an action for its collection. " The presumption is that it could have been collected, as the usual course is for men to pay their debts, and solvency is presumed until the contrary is shown. This is what was decided in *Stiles* v. *Guy* (16 Sim. 230 ; 39 Eng. Ch. 229), the vice-chancellor remarking that ' those who seek to exonerate themselves from a debt due from a third person ought to prove that that person could not have paid the debt. If a debt is due the law presumes until the contrary is shown that the debtor can pay it. Insolvency cannot be presumed.' " (*O'Conner* v. *Gifford*, 117 N. Y. 275–279.) The executors did obtain from Charles Wild security for some notes made by Wild, on which the deceased was an indorser, but never commenced an action against the makers of the note in question, and, as far as the proof shows, took no steps for its collection, beyond from time to time soliciting payment thereof of Charles Wild.

To excuse the executors from failing to institute legal proceedings to collect this note, they were compelled to show on the accounting that the note could not have been collected had an action been commenced thereon. It was not enough for them to produce evidence from which we might guess that legal proceedings would have been useless. They should have produced testimony which left no reasonable doubt in that regard. After a careful consideration of the evidence in the case relating to this note, we are of the opinion that the evidence produced by the respondents on the accounting was not sufficient to discharge them from liability for failing to take legal

proceedings to collect the note in question, with the amount of which they were charged on the inventory, under the doctrines enunciated in the cases last cited.

Letters testamentary were issued to the respondents on the 28th day of May, 1886. At that time Charles Wild owned and conducted a cotton mill at Valatie, N. Y. In September, 1886, he executed a mortgage thereon to the Hudson Savings Institution for $20,000, which, with other prior mortgages, made the incumbrances thereon $48,000. He testified on the trial that, at that time, the value of the mill property was less than the amount of the incumbrances. The force of his testimony is, however, weakened by the fact that afterwards, in November, 1889, he conveyed said real estate to his wife, such conveyance tending to show that he regarded the real estate as of some value over the incumbrances. Another disinterested and competent witness placed the value of the property at the time in question at $80,000. Charles Wild held the title to this real estate from the date of the appointment of the respondents until November, 1889. Though he testified that the property was worth less than the amount of the incumbrances, another witness estimated its value at almost double this amount. If Charles Wild had no other property than this mill, we think it was the plain duty of the executors to have obtained judgment on the note in question, and to have endeavored to collect it out of said real estate. The suggestion contained in the opinion of the referee, that had they made such attempt, Wild would have at once transferred the property to his wife, is mere speculation. But had he done so, it would not have changed the situation, as she was one of the makers of the note.

From May, 1886, to the autumn of 1889, Charles Wild conducted a large business in his said mill. He had a considerable bank account at the National Union Bank, and continuously made large purchases and large sales. We will not undertake to recapitulate the evidence, but the following extracts from his testimony on the trial will serve to show the extent of his business, and the personal property that he continually had on hand subject to levy and sale on execution during the years in question: " The value of the warp in the looms in the mill in the years 1886, 1887, 1888, 1889, taking a fair average for the whole year was: 1886, about $1,550; 1887, about $1,350;

1888, about $1,550; 1889, about $1,690. The value of the supply of cotton, coal and other supplies used or intended for use in the mill on hand each month, a fair average for the year 1886 was about $3,791.69; for 1887, $4,929.66; for 1888, $5,380.96; 1889, $5,140.29. Fair average of coal and all supplies was, 1886, $418.40; 1887, $402.17; 1888, $479.50; 1889, $411.84. That is for every month. The amount paid out for cotton for each year was, 1886, $44,500.38; 1887, $59,155.80; 1888 was $64,570.40; 1889 was $61,689.43. * * * Q. What did you pay for coal and other supplies for each of the years? A. In 1886, $5,020.88; 1887, $4,826.09; 1888, $5,754.09; in 1889, $4,941.99. * * * Q. Mr. Wild, give me amounts received by you from sales of cotton cloth manufactured in your mill at Valatie, New York, for each of the years 1886, 1887, 1888, 1889? A. In 1886, $86,875.56; in 1887, $107,374.04; 1888, $131,120.82; 1889, $119,506.23. Q. What amounts were received from you from all sales of waste, ties, etc., for each of the years 1886, 1887, 1888, 1889? A. In 1886, was $1,279.97; in 1887, $2,185.99; 1888, $2,129.88; 1889, $2,081.86. Q. What amounts were received by you for rents from the tenements connected with the cotton mill property, in each of the years 1886, 1887, 1888, 1889? A. In 1886, $1,992.30; 1887, $2,800.49; 1888, $2,184.48; 1889, $2,110.62. Q. What amounts were received by Mrs. Wild from her tenements? A. In 1886, $421.17; 1887, $443.30; 1888, $396.64; in 1889, $368.33. Q. What amounts were received by you for Mrs. Mary A. Wild, other than you have stated, in each of the years, 1886, 1887, 1888, 1889? A. In 1886, $483.15; in 1887, $99.60; no income in 1888 or 1889. Q. That was received by whom? A. Mrs. Mary A. Wild. Q. What amount of income did you receive for each of the years 1886, 1887, 1888, 1889, from the cotton manufacturing business carried on by you at Valatie, N. Y., at the cotton mill, taking the amount paid by you for interest, discounts or family or living expenses therefrom? A. In 1886, $8,384.53; in 1887, $2,513.56; 1888, $20,220.27; 1889, $19,270.71."

The testimony above quoted shows that Charles Wild had in his possession and under his control, during the years in question, a large amount of personal property, out of which a judgment on the note in question could have been collected. The testimony also shows that Mary A. Wild, the other maker of the note, at the time

in question owned real and personal property subject to levy and sale under execution, and from which, had the executors obtained judgment on the note, it might have been collected.

It is said that had the respondent commenced an action on the notes, Charles Wild would probably have transferred his property, so that it could not have been reached by execution, or he would have been compelled to close out his business. Such a suggestion is mere speculation. We think it more probable that, conducting as he was so large a business, rather than to have had that business sold out and his factory closed, if the executors had moved promptly and obtained a judgment on the note, he would have paid it. As he held the title to so large an amount of real and personal property, and was conducting so large a business, the fact that his property was incumbered and that he was embarrassed in his circumstances, and perhaps insolvent, did not relieve the respondents from the duty of active vigilance. Charles Wild owned a large amount of real and personal property. The latter was subject to levy and sale on execution. It was the duty of the respondents to endeavor to collect the amount of the note in question therefrom, and we are inclined to think, under the evidence, that, had they been diligent, they would have succeeded in such attempt.

The respondents suggest that they acted under and followed the advice of their attorney in reference to the claim against the Wilds. The advice of an attorney will not relieve an executor from the duty of active vigilance in the collection of the assets left by his decedent; he is bound to know his duty in that regard.

Our conclusion is that the testimony produced by the respondents fell short of showing that the note in question could not have been collected, had they proceeded with diligence to enforce payment thereon; and that hence they should be charged with the amount thereof, together with interest thereon from January 19, 1884, to the date of the entry of the decree of the final settlement.

The services of the accountants in relation to the real estate left by the decedent were performed in the discharge of their duty as executors, and hence they were not entitled to the allowance of $250 to each made by the surrogate therefor. (See *Lent* v. *Howard*, 89 N. Y. 169, 179; *Matter of Hayden*, 54 Hun, 197, 203.)

The distinction between the facts in this case and those considered

in *Lent* v. *Howard* (*supra*), where an allowance related to services relating to real estate was made, is apparent.

Other questions are raised in the points of counsel presented to us, but we do not deem it necessary to discuss them. We agree with the conclusions arrived at by the learned referee, except as above mentioned.

The decree of the surrogate should be modified in pursuance of the foregoing opinion as to the allowance made to the executors for the care of the real estate, and as to the loss on the "Wild" note, and as thus modified, affirmed, without costs to either party.

All concurred, except MERWIN, J., dissenting.

MERWIN, J. (dissenting):

I concur in result reached by Judge PUTNAM, except as to the "Wild" note.

Decree of surrogate modified as per opinion, and as modified affirmed, without costs to either party.