ALVIN B. CHARPIE et al., *Appellants*, v. HIRAM STOUT et al., *Appellees.*

No. 17,860.

SYLLABUS BY THE COURT.

1. EJECTMENT—*Equitable Oral Mortgage—Creditor in Possession.* One who had borrowed money from his sister-in-law caused tax titles upon a tract of land to be executed to her sister, who had no interest therein, and then turned over the possession, control and management of the tract to his sister-in-law, in pursuance of an agreement that the land should be used to pay the debt. The creditor took and held the actual possession of the land for eighteen years, and improved, cultivated, rented, managed and controlled it openly until her death, at which time it was occupied by her tenant under an unexpired lease. The tax titles were conveyed to her some time after the agreement was made, upon the direction of the debtor. The debtor, or his wife, to whom a conveyance was made subsequent to the agreement, took possession from the tenant at or before the expiration of the lease, without the consent of the lessor, her heirs or representatives, and without paying or offering to pay the debt. It is held that the possession so taken was wrongful.

2. —— *Same.* The form of an agreement by which security for the payment of money is given is not important, if the purpose plainly appears. Equity regards the substance and gives effect to the intention.

3. —— *Same.* A parol agreement to secure the repayment of money already advanced, by a lien or charge upon land, may be enforced by retaining the possession taken in pursuance of the agreement and held for many years thereunder, no steps having been taken to collect the debt.

4. —— *Same.* Agreements of the nature above referred to are usually termed equitable mortgages, but the name is not

important. If the effect is to create a lien to secure a debt, possession given to the creditor in pursuance of the agreement may be held under the rules applicable to mortgagees in possession. Equity requires the payment of the debt before relinquishment of the security can be compelled.

Appeal from Kingman district court. Opinion filed December 7, 1912. Reversed.

*J. Q. Jenkins,* and *John H. Connaughton,* both of Kingman, for the appellants.

*George L. Hay,* of Kingman, for the appellees.

The opinion of the court was delivered by

BENSON, J.: The petition first states a cause of action in ejectment in the usual form. In a second cause of action it is alleged that in the year 1891 Hiram Stout verbally agreed to transfer the title and possession of the tract in question, containing 40 acres, to Belle Charpie in consideration of $2000, which he had previously borrowed from her; that in September of that year he procured a tax deed upon part of the tract, and a quitclaim deed from a tax-deed holder for the other part, to be made to Clara Charpie, a sister of Belle Charpie, for whose use they were intended, who entered into immediate possession of the land. It is further alleged that Clara afterward made a conveyance to Belle, who remained in the quiet and exclusive possession under the agreement until her death, which occurred on the 9th of May, 1909, but that the defendants took wrongful possession on or about March 1, 1910.

The plaintiffs, heirs at law of Belle Charpie, claim the land under the tax deeds, and also under the verbal agreement. Hiram Stout filed a disclaimer; Ed Patrick and wife claim no interest except as tenants. The issue was between the plaintiffs and Ella B. Stout, who holds under mesne conveyances from her husband, Hiram Stout.

From the testimony of Hiram Stout it appeared that Belle Charpie and Clara Charpie were sisters of his first wife, now deceased. In the year 1878 Mr. and Mrs. Stout and Belle removed to Kingman county from Indiana, their former home. Mr. Stout became financially embarrassed in the year 1887, and borrowed $1800 of Belle, who was then in the millinery business in Kingman and obtained the money for him by mortgaging her building. Judgments were outstanding against Hiram Stout, and he procured a tax deed and a conveyance from a tax-title holder of this land to be made to Clara Charpie in the fall of 1891, and then turned over the possession to Belle. Clara had no interest in the land, and afterwards made a conveyance to Belle, upon request of Mr. Stout. Concerning this agreement with Belle, Stout testified:

"I turned the possession of those two pieces of land over myself to Belle Charpie, to use, and I promised her at the time that I turned the land over to her that if I could get the land pulled out from under the load of judgments that was on top of it that I would use it to settle with her—use it to pay her with, if I could. Then I have been looking after it ever since, one way and another, although I left her in charge of it to handle it as about she pleased, so as to give her something to live upon. . . . The spring that she died we talked over selling the land, and said we would sell it as quick as we could get $100 per acre for it."

Answering the question whether he had any agreement or understanding with Belle that she should become the owner of the land, he said: "Never did; that was a matter that was unsettled." He also testified:

"I said to them (the plaintiffs), 'I have got $1800.00 of Belle, and I expected to use this land to pay the $1800.00; that I promised Belle that I would use it if I could get it out from under the load that it was carrying, and all that they could hope out of that, would be what would be due in settlement for the $1800.00. I did not know definitely the sum of money at all."

The evidence shows that Mr. Stout was closely associated with Belle through family relationship and was her confidential adviser in business matters. From the time of the arrangement made in September, 1891, until her death she openly held possession of the land, made leases in her own name, collected rents, and managed and controlled it in all respects as the owner until her death in May, 1909. At that time it was in the possession of her tenant. In the year 1895 she moved a building upon it, out of which she constructed a dwelling house and barn. She had previously set out fruit trees upon it which are now in bearing. It was unimproved when she took possession, but appears to have been cultivated ever since by her and her tenants. At the time of Belle's death the land was occupied by her tenant, under a lease from her, upon a term which expired March 1, 1910. At that time, or shortly before, Stout took possession, apparently from this tenant, and turned it over to Patrick as his tenant.

The court sustained a demurrer to the evidence relating to the first cause of action, which appears to have been treated as based upon the tax titles, and submitted the case to the jury upon the single question whether Belle Charpie had held the open, exclusive and adverse possession of the land for fifteen years. The jury were instructed in the meaning of these terms, and answered questions submitted upon that issue, and returned a verdict for the defendants.

It is contended by the plaintiffs (appellants) that the issues upon their first cause of action should have been decided in their favor upon the tax deeds, upon which no irregularities appeared. The evidence, however, showed that the deeds were procured by the owner as a cover to protect the land from judgments against him. In view of the conclusion reached upon another feature of this case we need not consider the question whether this defense to the tax deeds is avail-

21—88 KAN.

able where it is interposed by the party who procured the deeds to be thus made, or one in privity with him, in the situation here presented.

In the second cause of action a verbal agreement to convey the land, accompanied by the transfer of actual possession, in consideration of money already advanced was pleaded. The testimony of Mr. Stout himself, which is undisputed, proves that he placed his creditor, Belle, in possession as security for the debt. She never yielded the possession and the debt is not paid. The transaction, as testified to by Mr. Stout, was a pledge of the land as security for the money borrowed. The form of an agreement by which security is given is unimportant if the purpose plainly appears. Equity regards the substance and gives effect to the intention.

"Courts of equity are not governed by the same rules as courts of law in determining whether a mortgage has been created; and generally, whenever a transaction resolves itself into a security, or an offer or attempt to pledge land as security for a debt or liability, equity will treat it as a mortgage without regard to the form it may assume." (27 Cyc. 976.)

"The form or particular nature of the agreement which shall create a lien is not very material, for equity looks at the final intent and purpose rather than at the form; and if the intent appear to give, or to charge, or, to pledge property, real or personal, as a security for an obligation . . . the lien follows." (3 Pomeroy's Equity Jurisprudence, 3d ed., § 1237.)

"If the transaction resolve itself into a security, whatever may be its form, it is in equity a mortgage." (Story, J., in *Flagg v. Mann et al.*, [U. S. C. C.] 2 Sumn. 486, 533.)

(See, also, *Harrigan v. Gilchrist*, 121 Wis. 127, 361, 99 N. W. 909; 1 Beach on Modern Equity Jurisprudence, § 291; Boone on Mortgages, § 31.)

A case arose in Indiana where the agreement was quite similar to the one shown by the evidence here. The use and control of land had been turned over to a

creditor until it should be sold, when the debt was to be paid, together with one-half the advance over that amount, received on the sale. No time was fixed for payment of the debt. The court said:

"The instrument is not a lease; it has none of the features of a lease except that of possession, and that is a feature not peculiar to leases. The instrument is a mortgage, for it evidences a debt, contains a promise to pay it out of the land, and puts the land in the possession of the creditor until payment of the debt. It is not the usual mortgage, perhaps not a complete one, but it is sufficient to vest in the creditor a right to have the land pledged to him and put into his possession, sold to pay the debt; in short, it is an equitable mortgage." (*Brown et al. v. Brown*, 103 Ind. 23, 27, 2 N. E. 233.)

In that case, and many others of like effect which might be cited, the agreements were in writing, but a parol agreement of this nature may be enforced when partially performed as in this instance. (*Foster v. Bank*, 71 Kan. 158, 80 Pac. 49, 6 A. & E. Ann. Cas. 44, 114 Am. St. Rep. 475; *Dean v. Anderson*, 34 N. J. Eq. 496; *Byers v. Johnson*, 89 Iowa, 278, 56 N. W. 449; *Thalheimer Bros. v. Tischler, et al.*, 55 Fla. 796, 46 South. 514, 15 A. & E. Ann. Cas. 863.)

The money had been advanced, possession given; and held under the agreement for over eighteen years and permanent improvements made by the holder who took no other steps to collect her debt. This is sufficient performance to remove the case from the operation of the statute of frauds. There is no claim that the debt has been paid. Stout could not have recovered possession from Belle Charpie in her lifetime without offering payment of the amount justly due. Possession obtained from her tenant without her consent would have been in violation of the pledge and wrongful. The legal situation was not changed by her death except that her heirs succeeded to her rights.

Evidence was offered and partially given, but ex-

cluded, which apparently would have tended to show that the possession was taken by Stout in February, 1910, from the tenant of the deceased lessor. The evidence was competent, but excluding it from consideration, and supposing that the defendants found the premises vacant, and moved in after the tenant had moved out, still possession so obtained without payment of the debt and without the consent of the lessor or her heirs was wrongful. The heirs should still be treated as mortgagees in possession and entitled to hold that possession until payment of the debt.

"A mortgagee in the lawful possession of mortgaged premises can not be ousted or deprived of his rights as such against his will or by anything in fact short of redemption and complete satisfaction of the mortgage debt." (*Stouffer v. Harlan,* 84 Kan. 307, 313, 114 Pac. 385.)

(See, also, *Pettit v. Louis,* 88 Neb. 496, 129 N. W. 1005, 34 L. R. A., n. s., 356.)

It is true that the testimony does not show an agreement to execute a formal mortgage. Fearing the enforcement of judgments Stout did not care to proclaim his ownership to the land, obscured by the tax deeds to Clara Charpie; and Belle Charpie, relying upon his fidelity in this as in other business transactions, accepted and held the security as he offered it, with the tax deed made to her sister, who afterwards conveyed to her. Such agreements are usually termed equitable mortgages, but we are not concerned about the name; the effect of the transaction was to create a lien upon the land to secure the debt, and under the rules applicable to mortgagees in possession equity requires the payment of the debt before relinquishment of the security is compelled. Ella Stout acquired no better rights in the land than her husband had, and took the title subject to the rights of Belle Charpie and her heirs.

Upon the undisputed evidence the judgment should have been rendered in favor of the plaintiffs.

The judgment is reversed and cause remanded with directions to enter judgment accordingly. If the defendants desire they should be allowed, on payment of costs already accrued, to amend their pleadings by offering to redeem the land and making other proper averments, in which event the action may further proceed as though brought by them for redemption, but in the meantime possession should be restored to the plaintiffs.