SCOTT et al., Respondents, v. TUGGLE, Admr., Appellant.

(No. 5,712.)

(Submitted October 23, 1925. Decided November 12, 1925.)

[241 Pac. 229.]

*Executors and Administrators—Failure to Collect Debts Due Estate—Objections to Final Account—Estoppel.*

Executors and Administrators—Chargeable With Loss Occasioned by Failure to Enforce Equitable Lien.

1. Where a defaulting vendee of farm lands in consideration of being permitted to remain in possession agreed in writing to give the vendor a promissory note secured by a crop mortgage for moneys due, an equitable lien was created though neither note nor mortgage were ever given, which lien the administrator of the estate of the vendor, knowing of its existence, was in duty bound to collect, if possible, and for his failure to attempt to collect he was chargeable in his account for the resulting loss.

Same—Failure to Collect Debts Due Estate—Reliance on Advice of Attorney No Defense Against Liability.

2. An administrator may not excuse his failure to collect a debt due to the estate of his decedent by reliance upon the advice of an attorney that an attempt to collect would result in litigation and delay in settlement of the estate.

Same—Mismanagement of Estate—Estoppel of Heir by Acquiescence—What Does not Constitute.

3. Where a nonresident heir of a decedent in writing acquiesced in the appointment of any person whom the widow might wish appointed as administrator, and until rendition of his account knew nothing of the manner in which the estate had been handled, she was not by such acquiescence estopped from asserting mismanagement on the part of the administrator.

Same—Failure to Collect Debts Due Estate—Estoppel of Heir to Object by Own Conduct in Management of Estate.

4. Under the rule that the consent of persons interested in an estate to the actions of the administrator in handling it will relieve him from losses resulting therefrom, *held*, that where the widow had an understanding with the administrator that she should have complete control of the estate and the administrator's activities should be confined to formal probate matters, and the agreement was carried out, the widow was precluded from complaining of the failure of the administrator to collect an equitable lien on crops, especially where she had disapproved of all his suggestions looking toward collection.

Chattel Mortgages, 11 **C. J.**, sec. 71, p. 453, n. 88.

Estoppel, 21 **C. J.**, sec. 222, p. 1217, n. 69; p. 1218, n. 82; sec. 223, p. 1219, n. 91 New.

Executors and Administrators, 24 **C. J.**, sec. 576, p. 124, n. 67; sec. 584, p. 126, n. 82; sec. 589, p. 127, n. 93; sec. 590, p. 128, n. 97.

*Appeal from District Court, Custer County; S. D. McKinnon, Judge.*

OBJECTIONS to the final account of Robert F. Tuggle, as administrator of the estate of Thomas C. Scott, deceased, by Grace A. Scott and others, were sustained, and the administrator appeals. Remanded, with directions to modify order of settlement and, when modified, same to stand affirmed.

*Mr. W. H. O'Connell* and *Messrs. Walker & Nelstead,* of Counsel, submitted a brief; *Mr. O'Connell* argued the cause orally.

Executors are not liable in the absence of gross negligence beyond what they have actually received. (*In re Dauler's Estate,* 247 Pa. 356, 93 Atl. 511.) If an administrator has acted in good faith and has been guilty of no mismanagement, he is not liable. (23 C. J. 1203.) Executors and administrators are required, in reference to the administration of an estate, to use—not the highest degree of skill—but ordinary care, prudence, skill and diligence. (11 R. C. L. 140.) When administrators act in good faith and without willful default or fraud, they are not responsible for any loss to the estate. (*Webb's Estate,* 165 Pa. 330, 44 Am. St. Rep. 666, 30 Atl. 827; *In re Kohler's Estate,* 15 Wash. 613, 55 Am. St. Rep. 904, 47 Pac. 30; *Harris* v. *Orr,* 46 W. Va. 261, 76 Am. St. Rep. 815.)

The attorney for the administrator advised against becoming involved in litigation with Mr. Laporte. In *Pearson* v. *Gillenwaters,* 99 Tenn. 446, 63 Am. St. Rep. 844, 42 S. W. 9, the court said: "So, also, if the representative delay at the request or instance of the parties beneficially interested, or under their advice, and, in consequence, a loss is sustained, the representative cannot, by such interested party, be charged with such loss. (*Perry* v. *Wooton,* 5 Heisk. (Tenn.) 524; *Poole* v. *Munday,* 103 Mass. 174; 7 Am. & Eng. Ency. of Law, 359; *Ward* v. *Tinkham,* 65 Mich. 695, 32 N. W. 901.) And

so, when the administrator or executor acts in accordance with the advice of counsel, it should be within proper limits, a protection to him. (*James* v. *Wingo,* 7 Lea, 148.) And especially is this so when the advice is given as to the advisability of bringing suits and defending against suits or claims. It is the duty of the representative in such cases to seek counsel, and to be influenced and, within reasonable limits, to be controlled by it." (See, also, *Sharp's Estate,* 61 N. J. Eq. 601, 48 Atl. 327; *Orr* v. *Orr,* 34 S. C. 275, 13 S. E. 467; *Perry* v. *Wooton,* 5 Humph. (Tenn.) 524; *Taylor* v. *Sanson,* 24 Cal. App. 515, 141 Pac. 1060.)

*Messrs. Brown & Jones* and *Mr. Geo. W. Farr,* for Respondents, submitted a brief; *Mr. Farr* argued the cause orally.

"The fact that an executor acted on the advice of counsel will not excuse him, though that fact is entitled to consideration in his favor." (*King* v. *Berry,* 3 N. J. Eq. 261.) "Relying on advice of counsel cannot make that conduct prudent which the law regards as careless." (*Doran* v. *Dazey,* 5 N. D. 167, 57 Am. St. Rep. 550, 64 N. W. 1023.) "It was the duty of the executor to execute his trust himself, and he cannot rid himself of responsibility by employing an attorney to do that which he ought to have done himself." (*In re Estate of Sanderson,* 2 Cal. Unrep. 750, 13 Pac. 497; see, also, *Klein* v. *French,* 57 Miss. 662; *Matter of Hosford,* 27 App. Div. 427, 50 N. Y. Supp. 550; *Kauffeld's Estate,* 28 Pa. Super. 162.)

Failure to collect debts due the estate, unless delayed without his fault, renders the executor liable for loss to the estate. Citations that are pertinent and conclusive of the above rule of law are as follows: *Sanderson Estate,* 74 Cal. 199, 15 Pac. 753; *Maddock* v. *Russell,* 109 Cal. 417, 42 Pac. 139; *Wheeler* v. *Bolton,* 92 Cal. 159, 28 Pac. 558; *Weeks* v. *Olpherts,* 100 U. S. 564, 25 L. Ed. 735; *Glasgow* v. *Lipse,* 117 U. S. 327, 29 L. Ed. 909, 6 Sup. Ct. Rep. 757 [see, also, Rose's U. S. Notes]; *Clark*

v. *Bundy,* 29 Or. 193, 44 Pac. 282; *Estate of Sarment,* 123 Cal. 331, 55 Pac. 1015.

An executor or administrator may be, and is, charged with the duty of foreclosing a mortgage by an action at law or by peaceable entry and possession or otherwise, just as his decedent might have done, whenever this becomes needful for realizing upon the secured debts or claims which the administrator has acquired by virtue of his office. (*In re Hobson,* 131 N. Y. 575, 30 N. E. 63, 67; *Scott* v. *Moore,* 4 Ill. 306; *Willis* v. *Willis,* 16 Ala. 652; 23 C. J. 1189.)

Tuggle, as administrator, was required to proceed promptly with the collection of the debts, and especially rents which were secured. (*Condit* v. *Winslow,* 106 Ind. 142, 5 N. E. 751; *Fredericks' Estate,* 54 Pa. Super. 535; *Matter of Hosford,* 27 App. Div. 427, 50 N. Y. Supp. 550.) "The duty to collect debts begins immediately after making the inventory." (*Powell* v. *Hurt,* 31 Mo. App. 632; *In re Sanderson* (Cal.), 13 Pac. 497; *Matter of Hosford,* 27 App. Div. 427, 50 N. Y. Supp. 550; *Sherrell* v. *Shepard,* 19 Fla. 300; 23 C. J. 1205, 1206.)

MR. JUSTICE STARK delivered the opinion of the court.

Thomas C. Scott died intestate on February 23, 1923, leaving estate in Montana, a part of which consisted of a ranch of approximately 8,000 acres of land known as the "Thomas C. Scott Home Ranch." At the time of his death Scott was a resident of Denver, Colorado, and left surviving him his widow, Mrs. Grace A. Scott, and a daughter, Emily Belle Scott. On petition of the widow, Robert F. Tuggle was appointed administrator of the estate of the deceased in Montana by an order of court duly given and made on March 31, 1923, qualified as such, and letters of administration were issued to him on April 5, 1923.

On March 20, 1924, the administrator filed a final account of his administration, which purported to contain a full statement of his transactions as such, asked that the account be

settled and that an order be made distributing the residue remaining in his hands to the persons entitled thereto. In due time the widow and daughter of the deceased, separately filed objections to the allowance and settlement of the account on many grounds, the only one of which we are required to consider being that the administrator had lost assets belonging to the estate through neglect of duty. Of the different specifications of such loss only one is before us for review, and that is the administrator's failure to collect and account for rents of the home ranch above mentioned for the year ending November 1, 1923.

After a hearing the court found that the administrator had been negligent in the respect charged; that the resultant loss to the estate was $2,748.32; that the administrator was entitled to the sum of $1,511.43 as his commission, and by an order directed that this sum should be deducted from the $2,748.32 which had been lost by his negligence; and that the administrator forthwith account to the estate for the difference of $1,236.89. From this order of settlement the administrator has appealed.

The facts shown at the hearing upon which the court based its finding that the estate had lost the rent of the home ranch for the period mentioned through the neglect of the administrator are as follows: On the fifteenth day of May, 1922, an agreement was entered into between the decedent, a man by the name of John Laporte, and the First National Bank of Miles City, Montana, which among other things, recited that Laporte was in possession of the home ranch under a contract of purchase; that he was in default in payments of principal and interest thereon and had failed to pay taxes, insurance and other charges which he had agreed to pay; that decedent had given Laporte notice of his intention to cancel and determine said contract and that his ejection from the premises was imminent; that the First National Bank of Miles City had a past-due mortgage upon Laporte's personal property located on the premises, and was desirous of keeping him in possession

thereof, and to that end agreed to pay certain sums of money to the decedent on behalf of Laporte, in consideration of the latter being given an extension of such possession. This agreement further provided that Laporte should execute a complete release and quitclaim of all his right, title and interest in and to the home ranch and deliver the same to the bank for delivery to the decedent in the event that he (Laporte) should make default in the performance of any conditions of this agreement, and also contained the following: "The said John Laporte shall forthwith on said date [November 1, 1922] execute a new note for the sum of $4,000, payable on the first day of November, 1923, bearing interest at the rate of ten per cent per annum after maturity, and secured by a chattel mortgage on all crops on the lands and premises herein described either sown, planted, cultivated, or harvested during the year 1923   *   *   *   ; it being the intention of the parties that the said Thos. C. Scott shall have the first lien upon the crops as security for the payment to be made to him by the said John Laporte."

When Tuggle, as administrator, took possession of the property of the estate, Laporte was in possession of and operating the home ranch under this agreement and continued to occupy it until after November, 1923, and during the season of 1923 produced thereon oats, hay and alfalfa seed of the value of $2,749.32, all of which he sold and disposed of for his own use and benefit. Although the administrator came into possession of the above-mentioned contract in April, 1923, when he took possession of the effects of the estate, he made no endeavor to collect any portion of the amount due or to become due thereon, and so received no rent for the home ranch during the year 1923.

Section 10257, Revised Codes of 1921, makes it the duty of [1] the executor or administrator to take into his possession all of the estate of the decedent, real and personal, and collect all debts due to the decedent or to the estate; and, under the provisions of section 10282, he is chargeable in his account with

the whole estate of the decedent which may come into his possession, at the value and appraisement contained in the inventory, except that, by the provisions of section 10284, he is not accountable for any debts due the decedent if it appears that they remain uncollected without his fault.

Although no formal note or chattel mortgage was executed by Laporte as provided for in the agreement under which he was in possession of the home ranch, nevertheless this agreement obligated him to pay the sum of $4,000 on November 1, 1923, and created an equitable lien in favor of decedent upon all the crops grown or produced on the ranch during that year as security for such payment.

In 3 Pomeroy's Equity, fourth edition, 1235, it is said: "The doctrine may be stated in its most general form, that every express executory agreement in writing, whereby the contracting party sufficiently indicates an intention to make some particular property, real or personal, or fund, therein described or identified, a security for a debt or other obligation, or whereby the party promises to convey or assign or transfer the property as security, creates an equitable lien upon the property so indicated, which is enforceable against the property in the hands, not only of the original contractor, but of his heirs, administrators, executors, voluntary assignees and purchasers or encumbrancers with notice." (See, also, *Reynolds* v. *Fitzpatrick*, 23 Mont. 52, 57 Pac. 452; *Savage Tire Co.* v. *Stuart*, 61 Mont. 524, 203 Pac. 364; 23 Cyc. 983; 11 C. J. 453; *In re Pittsburgh Industrial Iron Works* (D. C.), 179 Fed. 151; *Title Ins. & Tr. Co.* v. *California Dev. Co.*, 171 Cal. 173, 152 Pac. 542; *United States F. & G. Co.* v. *Fidelity Trust Co.*, 49 Okl. 398, 153 Pac. 195; *Hauselt* v. *Harrison*, 105 U. S. 401, 26 L. Ed. 1075 [see, also, Rose's U. S. Notes]; *Meridian Oil Co.* v. *Randolph*, 26 Okl. 634, 110 Pac. 722; *Higgins* v. *Manson*, 126 Cal. 467, 77 Am. St. Rep. 192, 58 Pac. 907; *Barnes* v. *Alexander*, 232 U. S. 117, 58 L. Ed. 530, 34 Sup. Ct. Rep. 276; *Charpie* v. *Stout*, 88 Kan. 318, 128 Pac. 396.)

And in section 1236, *Id.*, it is further stated: "It is well settled that an agreement to charge or to assign or to give security upon or to affect property not yet in existence or in the ownership of the party making the contract or property to be acquired in the future &ast; &ast; &ast; does constitute an equitable lien upon the property so existing or acquired at a subsequent time, which is enforced in the same manner and against the same parties as a lien upon specific things existing and owned by the contracting party at the date of the contract."

Since this agreement in itself created an equitable lien, equivalent to a chattel mortgage upon the crops therein mentioned, and, as the administrator knew of its existence, he was obligated to enforce its provisions, and is chargeable with whatever he should have collected thereunder, unless it appears that such amounts remain uncollected without his fault. (Section 10284, above.) It appeared in the testimony, without dispute, that Laporte was insolvent.

The administrator advanced two reasons to establish that it was not through his fault that collection was not made of the amount which should have been realized by the enforcement of this contract:

(a) He testified that at different times Laporte refused to [2] comply with the terms of the contract, and the administrator appears to have been fearful that if he had attempted to force Laporte to do so it would have led to litigation over the original contract between Scott and Laporte which had been superseded by the one of May 15, 1922, and would thereby have caused delay in getting possession of the ranch for the heirs. He also testified that counsel had advised him that such a result might follow and this is advanced as an excuse or defense of his failure to force collection of the rental from Laporte to the extent that it might have been collected by availing himself of the provisions of the contract. There was, however, no evidence that Laporte was threatening to make or had made any claim against the estate under

the old contract. The suggestion that he might make such a claim was mere speculation. The duty of the administrator to endeavor to make collection of this debt and to avail himself of the security held therefor was imposed upon him by the statute. (Section 10257, *supra*.) The rule is well stated in *Re Hosford*, 27 App. Div. 427, 50 N. Y. Supp. 550, as follows: "The advice of an attorney will not relieve an executor from the duty of active vigilance in the collection of the assets left by his decedent; he is bound to know his duty in that regard."

(b) The second defense advanced by the administrator to [3] relieve himself from liability for failure to collect this rent was that such failure was due to the solicitation and acquiescence of the beneficiaries Mrs. Grace A. Scott and Emily Belle Scott.

This defense is primarily based upon a contract designated in the evidence as Exhibit 1, which was entered into between Tuggle and the widow, Mrs. Grace A. Scott, on March 17, 1923, before the latter filed the petition asking for the appointment of Tuggle as administrator, in which it was agreed (1) that, if Tuggle should be appointed administrator, he should receive as compensation for his services two per cent of the appraised value of the estate in Montana; and "(2) that in the handling of the properties of the said estate in the state of Montana said first party [Mrs. Scott] shall have complete control at all times of all business arrangements of and in connection with the said properties belonging to said estate, real, personal, and mixed, and that said second party's [Tuggle's] control of the said properties shall only be to the extent of what may be required for the purposes of properly probating the affairs of the said estate."

It is contended that the other heir, Emily Belle Scott, is bound by the terms of this agreement, for the reason that on March 10, 1923, she signed a certain document which was introduced as Exhibit "D," and which reads as follows:

"To Whom It may Concern: Anything which my mother wishes to do or any one that she wishes to appoint as ad-

ministrator of the estate in Montana will be satisfactory to me,
the daughter.                              "EMILY BELLE SCOTT.

  "Denver, Colorado, March 10, 1923."

  In passing, we shall first dispose of the contention that
Emily Belle Scott is bound by the terms of the agreement
between Tuggle and Mrs. Scott to the same extent as the
latter.

  As shown on its face, Exhibit "D" was signed at Denver,
Colorado. It does not appear in the record that Emily Belle
Scott was ever in Montana after its execution; that she in
any manner participated in the affairs of administration; or
that at the time of the execution of this instrument she
knew of the existence of the Laporte agreement. While this
document bound the daughter to acquiesce in the appointment
as administrator of any person whom the mother might
select, it would be going far beyond anything. therein con-
tained, either by direct statement or by reasonable inference,
to hold that it deprived her of the right to object to the
negligence or mismanagement of the estate by the administra-
tor who might be selected by the mother. Her rights to
make such objection are the same as though Exhibit "D"
had never been executed or anything done thereunder.

  Reverting now to the situation between the administrator
[4]  and Mrs. Scott: A reference to Exhibit 1 clearly indi-
cates that it was the intent that the latter should have com-
plete control of the business management of the estate and
that the former should have no connection therewith except such
as was necessary for the formal matters pertaining to the
probate of the estate. So far as the management and control
of the home ranch was concerned, this agreement seems
to have been carried. into effect.

  The administrator testified that he undertook to induce Mrs.
Scott to make some arrangement with Laporte in reference to
his retention of the ranch during the year 1923 which would
have inured to the benefit of the estate, but that he could
not do so because Mrs. Scott refused to agree to anything

which Laporte offered, and it appears that the latter was allowed to remain on the ranch until November 1, 1923, without anything being done by either the administrator or Mrs. Scott.

Shortly after Tuggle's appointment he had Laporte come in from the ranch and in conjunction with Mrs. Scott had numerous interviews with him concerning the latter's complying with the terms of the contract of May 15, 1922. Laporte said he was broke and could not pay anything. Mrs. Scott advised Tuggle that it was for the best interest of the estate to get along easy with Laporte and get him off the ranch; that she did not want to get mixed up with him any more than possible. Laporte wanted to give up the ranch, but offered to stay there and take care of it until November 1, 1923, for $60 per month. This proposition was refused by Mrs. Scott. Laporte then proposed to retain the ranch until November 1 and turn over one-third of the crop as rental. This proposition Mrs. Scott also declined. Although Tuggle advised her that he thought it would be the best thing for the heirs to accept this proposition this advice was not accepted. She said that all she wanted was to get rid of Laporte without any litigation; that she wanted to get possession of the ranch as soon as possible, and, as above stated, Laporte appears to have been permitted to remain on the ranch without any special arrangements concerning his occupancy until November 1, and thereafter, with the advice and consent of Mrs. Scott, the ranch was leased to Laporte from November 1, 1923, to April 1, 1924, for $375. In the spring of 1924, Mrs. Scott proceeded to make arrangements for handling the ranch during that year without consulting the administrator.

The consent of persons interested in a decedent's estate to the action of the administrator will, as a rule, relieve him from liability for losses resulting therefrom. (11 R. C. L. 142, sec. 149; *Swaine* v. *Hemphill*, 165 Mich. 561, 40 L. R. A. (n. s.) 201, 131 N. W. 68; *Pearson* v. *Gillenwaters*, 99 Tenn. 446, 63 Am. St. Rep. 844, 42 S. W. 9; *Foster's Executor* v. *Stone*, 67 Vt. 336, 31 Atl. 841; *Perry* v. *Wooton*, 5 Humph. (Tenn.)

524; 2 Woerner's American Law of Administration, p. 1024.) Of course, an administrator cannot escape liability for the nonperformance of the duties imposed upon him by delegating their performance to another, but in reason and under the above authorities, if a person who is entitled to distribution induces the administrator to permit him to manage the properties of the estate and such management results in loss, the one so managing the properties cannot complain that the loss was caused through the negligence of the administrator.

When it is considered that, by the terms of her contract with Tuggle, Mrs. Scott had "complete control at all times of all business arrangements of and in connection with" all the properties of the estate; that, during all of the year 1923 down to November 1, she made no suggestion that the administrator should do anything concerning the Laporte contract except to try to get him off the ranch as soon as possible, and effectually blocked every proposition made by the administrator which would have inured to the benefit of the estate, it seems to us that she should now be precluded from claiming that any loss which she sustained in connection with the home ranch was due to the fault of the administrator.

A proper disposition of this proceeding requires that the administrator shall account to Emily Belle Scott, the daughter, for her distributive share of the $2,748.32 lost to the estate by his failure to collect the same, but that he shall not be required to account to Grace A. Scott for any portion of said amount.

The cause is remanded to the district court, with direction to modify the order appealed from as above indicated, and, when so modified, the same will stand affirmed.

The appellant will recover from the respondent Grace A. Scott his costs on this appeal, and the respondent, Emily Belle Scott will recover her costs on appeal from the appellant.

*Modified and affirmed.*

Mr. Chief Justice Callaway and Associate Justices Holloway, Galen and Matthews concur.