## SWAINE *v.* HEMPHILL.

1. Estates of Decedents — Executors and Administrators — Duty to Close Estate—Liability. ·
   Where an administrator continued a manufacturing business of the estate for several years with the consent of the widow and children of deceased, in good faith· and in order to sell the business as a going concern, and lost money without his fault, he is not chargeable with the amount of such losses.

2. Same—Liability for Losses.
   It is ordinarily the duty of administrators to liquidate estates without undue delay, and if they violate the rule, even in good faith, they are held strictly liable for all losses incurred, and are not permitted to offset against them profits that they may have made.

Appeal from Washtenaw; Kinne, J.   Submitted March 2, 1911.   (Docket No. 130.)   Decided May 8, 1911.

Bill by Lizzie Swaine, Florence Swaine, and Jessie Swaine, against Robert W. Hemphill to set aside his discharge as administrator of the estate of Frederick J. Swaine, deceased, and for an accounting. From a decree dismissing the bill of complaint, complainants appeal. Affirmed.

165 Mich.—36.

*Allen Campbell* (*William Lucking*, of counsel), for complainants.

*John P. Kirk*, for defendant. ·

Complainants are, respectively, the widow and daughters of Frederick J. Swaine, who died intestate on April 14, 1897. Deceased had for many years prior to his death been engaged in the malting business in the city of Ypsilanti. Defendant, who was at that time cashier of the Ypsilanti Savings Bank, was appointed, first special, and later general, administrator of the estate. As such administrator, he continued the business of the deceased from April, 1897, to November, 1903, when his final account was allowed and his bond canceled. Complainants signed a waiver of notice of hearing upon defendant's final account, and at the same time executed a power of attorney authorizing him to continue the business, which he did until November, 1904, when it was closed out. At that time there remained due from the estate to the Ypsilanti Savings Bank the sum of $4,000. The bill of complaint sets out at length the dealings of defendant with the estate, and avers that it was complainants' expressed desire that the business should be continued only so long as it was profitable, that defendant, without informing them, continued to run it at loss, and that he fraudulently secured their consent to his discharge as administrator and the cancellation of his bond as such. Complainants pray that the order allowing the final account and discharging defendant as administrator be set aside because procured by fraud, and that his bond be reinstated; that defendant be held liable for all losses occasioned by the conduct of the business and ordered to reimburse complainants therefor. Defendant answered, denying all material averments of the bill. From a decree dismissing the bill, complainants have appealed.

BROOKE, J. (*after stating the facts*). The record conclusively shows that at the death of Frederick J.

Swaine, his personal estate amounted to $16,261.01, and that included in this sum were notes of the Ann Arbor Brewing Company for $4,485.79 and note and account of Kolb Bros. for $7,300. Swaine at that time was indebted in the sum of $16,132.14, $10,500 of which he owed to the Ypsilanti Savings Bank. If all the assets of the personal estate had been collectible, they would barely have equaled the liabilities. By carrying on the business for nearly eight years, the Kolb Bros. account was collected in full and the Ann Arbor Brewing Company account was reduced so that the final loss upon it was less than $2,500. The personal estate in the hands of defendant was increased shortly after Swaine's death by the payment to him by the widow of $5,450, which she had received as insurance on her husband's life, and as a legacy from a brother. This money was used by defendant to liquidate, in part, the obligations of the estate. During the entire time defendant ran the business he paid to complainants the sum of $9,493.88. He likewise paid for improvements to the real estate at complainants' request the sum of $1,578.66, and during the whole period the residence of complainants was heated at the expense of the business, and one of the men employed at the plant did various odd jobs about complainants' home. According to a statement from defendant's books, conceded to be correct by complainants, it appears that the net loss on manufacturing account for the whole period of eight years was $1,685.65, or a little over $200 per year. The continuation of the business probably facilitated the collection of doubtful or slow assets of the estate. We do not think it can be said that complainants would have been better off than they are had the entire matter been closed up at once upon the death of Swaine. Some profit appears to have been realized in each of the first three years. Thereafter the statement shows losses in three of the years and profits in two. The losses during the latter part of the operation appear to have been caused in part, if not wholly, by competition with large manufacturers of malt, who sold at prices so

low that this small plant could not make a profit if it met them. We think the record shows with sufficient certainty that the business was continued with the consent and at the solicitation of all of the complainants. Lizzie Swaine, the widow, seems to have taken an active and somewhat unusual interest in its prosecution. There is no claim made that defendant has not kept a proper and correct account of his dealings with the estate, nor that he has failed to account for every dollar which has come into his possession as administrator. The continuation of the business after the third year was probably an error of judgment, but it was one for which defendant should not alone be held responsible. Mrs. Swaine's brother, a business man of Kansas City, frequently visited with and advised the complainants.

Upon this question, the testimony of F. B. Worden, who was foreman of the malt house under Mr. Swaine, in his lifetime, and who occupied the same position under the administrator, is in part as follows:

"The malt house is about a mile from Mr. Hemphill's office. At Mr. Swaine's death, I told Mrs. Swaine I would not run the business if I was in her place. She said her brother thought it ought to be run, and she thought he knew. Her daughters were not present at this conversation. Mrs. Swaine came quite often to the malt house. Her daughters came also, every few days. Mr. George came from Kansas City every fall. We started buying barley to be manufactured into malt in the fall.

"*Q.* And about every fall Mr. George would come from Kansas City?

"*A.* I think nearly every fall. I would not say sure every fall.

"*Q.* Would Mr. George advise with you and Mr. Hemphill when he came down?

"*A.* He always advised me to run it as heavy as I could.

"*Q.* Did Mrs. Swaine ever say she was being advised and governed by her brother, Mr. George?

"*A.* I don't know as she said those words. She always seemed to me to be depending upon him to come over. I

think we both looked for him to come over before we started.

"*Q*. When Mr. George came, do you know about his coming to Ann Arbor to look after the account with the A. A. Brewing Company?

"*A*. Yes; I came with him."

As to the effect of competition and Mrs. Swaine's knowledge of the business, this witness further testified:

"The trust had a bad effect on the business and on some of our customers. I think we received one or two letters asking us to join the trust. Kolb Bros., of West Bay City, was one of our best customers. We never lost a customer by the trust. We had to sell cheaper. Kolb Bros. informed us they could buy their malt from Milwaukee at four or five cents less a bushel than they could buy it of us. The last few years we had to meet that price in order to sell, and I presume that had something to do with the loss the last year or two. In the fall we go and buy barley, and then if you had a competitor that would sell it cheaper than you could afford to sell it, you couldn't help but make a loss out of it. We certainly had to sell at the price made by the Milwaukee concern, or could not sell. We had to compete with Milwaukee the last few years. We had to meet this competition. Malt sold for 50 cents a bushel, and some we would get at 54 and 55. We never lost a bushel of malt through its being damaged or having it returned to us. Mrs. Swaine kept a book showing what we paid for the barley and all the prices. She never passed two or three days without coming to the plant. In the fall she inquired as to how much barley was bought, and took my book and checked it off as it was drawn in, and knew how much was bought. She kept an account of the malt that was sold. She would get that out of the book by the scales. This book showed how much was being sold and to whom, and the price obtained, and she knew this during the time the business was conducted. The home was heated from the malt house. One of the men from the malt house would hitch up the carriage for Mrs. Swaine. The men in the malt house fixed up the yard. The residence was not more than 100 feet from the malt house, and complainants must have known the number of men employed at the malt house. Always four employed."

Defendant is charged with fraud in procuring the con-

sent of complainants to the allowance of his final account. We think the method he pursued while thus dealing with three women, who were not advised by counsel, is not to be commended, but, as the account itself has in this proceeding been subjected to scrutiny and found to be correct, we are unable to see how complainants were injured by its allowance, and the discharge of the bond, unless it should be held that defendant is liable for the losses sustained by reason of continuing the business.

No reason is apparent or indicated by complainants why defendant should have wished to continue the business at a loss. By a forced liquidation of the entire estate at the time of Swaine's death, it is probable that the debt due to the bank of which he was cashier would have been paid. His compensation as administrator was small and the labor connected with his office considerable. It is said the bank profited largely through the discount of the paper of the estate during the period. It does not appear that the bank charged more than the usual rate of discount. Moreover, the bank accepted some $3,000 worth of bonds of the Ann Arbor Brewing Company in lieu of notes for that amount upon which the estate was indorser, reducing the contingent liability of the estate to that extent. These bonds, if not entirely worthless, are of little value.

We are of opinion that it was the conviction of all the complainants, as well as of Mr. George, the widow's brother, in whose judgment the family had confidence, that it was best to continue the business in the hope that it might be disposed of as a going concern. Changes and improvements in the method of manufacturing malt, and large combinations of malting interests, made it impossible to realize this hope. It would be unjust and inequitable to now compel this defendant to bear the loss occasioned by this course of action.

The duty of administrators generally to liquidate estates without undue delay is not questioned, nor can it be doubted that they cannot leave estates at the risk of busi-

ness disaster by continuing without authority to operate business ventures in which the estates are invested when they come into their hands. The authorities cited by complainants clearly establish this doctrine, and executors or administrators who violate the rule, even if acting in the utmost good faith, are held strictly liable for all losses incurred, and are not even permitted to offset the profits against the losses. *Ward* v. *Tinkham*, 65 Mich. 695 (32 N. W. 901); *Warren* v. *Union Bank*, 157 N. Y. 259 (51 N. E. 1036, 43 L. R. A. 256, 68 Am. St. Rep. 777); *Mattocks* v. *Moulton*, 84 Me. 545 (24 Atl. 1004); *Lucht* v. *Behrens*, 28 Ohio St. 231 (22 Am. Rep. 378); *Guthrie* v. *Wheeler*, 51 Conn. 207.

There seems to be no doubt, however, that, when all those interested in an estate agree that a certain course should be followed, the executor or administrator will be relieved from personal liability if disaster follows. Schouler on Executors, p. 422, lays down the rule as follows:

"We may presume that the personal representative can never be strictly justified in deviating from the line of bailment or fiduciary duty. But, in case of doubt as to his proper course, he may protect himself by prudently pursuing in advance one of two courses: (1) He may procure the advice and consent of all the parties in interest; or (2) he may take the direction of the court. * * * He may prosecute or defend suits, compromise claims upon the estate, or deal with the estate in a particular way, not usual or strictly legal, as by continuing the property in business; and those parties in interest, by whose request or assent it has been done, will not be permitted to impute it as maladministration"—citing *Poole* v. *Munday*, 103 Mass. 174; *Perry* v. *Wooten*, 5 Humph. (Tenn.) 524; and *Watkins* v. *Stewart*, 78 Va. 111.

1 Perry on Trusts (5th Ed.), § 454, contains the following:

"So trustees are not bound to continue the capital in such trade, and they ought not to do so against their judgment. But if all the *cestuis que trust* are *sui juris*, and capable of acting for themselves, and they desire an

executor, administrator or trustee to continue the business of the testator a few months, in order to preserve it for his son, and the executor acts in accordance with their request, and uses his best skill and judgment in the conduct of the trade, he will be allowed for the loss in his accounts."

In *French* v. *Davis*, 38 Miss. 167, it is said:

"It is certainly true, that it is competent for adult heirs at law to consent, or agree, that the property of the intestate should be kept together for the support of their mother, or for any lawful purpose, and such consent will justify the administrator, in the absence of creditors, or so far as the distributees are concerned, in conforming his action to their wishes on this subject."

The case of *Mathews* v. *Sheehan*, 76 Conn. 654 (57 Atl. 694, 100 Am. St. Rep. 1017), cited by complainants, reiterates the familiar rule as to the duty of administrators generally, but adds:

"Where an administrator or an executor, acting in good faith and with ordinary care and prudence for the good of the beneficiaries of the estate, deviates, with their consent and approbation, from the strict line of his duty, and loss results therefrom—as for instance by continuing the property in business without authority—the consenting beneficiaries cannot charge the representative of the estate with such loss."

See, also, *Pearson* v. *Gillenwaters*, 99 Tenn. 446 (42 S. W. 9, 63 Am. St. Rep. 844), and 18 Cyc. p. 243, note 75. In *Brown* v. *Forsche*, 43 Mich. 492 (5 N. W. 1011), Mr. Justice COOLEY said:

"Formal proceedings for the settlement of an estate are never necessary if all parties concerned can agree to dispense with them [citing cases]. Family arrangements for this purpose, it is said, are favorites of the law, and, when fairly made, are never allowed to be disturbed by the parties, or by any others for them. * * * Such an arrangement may be made after an administrator is appointed as well as before, and if the administrator is afterwards summoned to render his accounts, the court will accept as satisfactory, so far as it goes, the settlement the parties concerned have made."

It is to be noted that no complaint is made of the continuation of the business during the first three years while it was making a profit. During those years, the youngest daughter attained her majority, and had then a right, as well as her mother and elder sister, to demand its discontinuance. This neither she nor they did. The brother of the widow went over the books of the estate from time to time and advised with complainants.

We think it must be held that complainants themselves authorized defendant's acts, and that, if the estate is a loser thereby (which is not at all certain), they must bear the loss

The decree is affirmed, with costs to defendant.

OSTRANDER, C. J., and McALVAY, BLAIR, and STONE, JJ., concurred.