This is an appeal by creditors of the Ruggles estate from a portion of the order of the probate court which allowed the second annual account of the testamentary trustees, the appeal being limited to the sole question of the court's approval of the acts of the testamentary trustees in connection with a certain logging contract.
The testamentary trustees received the assets of the estate from themselves as executors upon the express condition that they were to be held in trust for the payment of certain debts before disbursements could be made upon charitable bequests or legacies. Upon the same day that the order was entered by the probate court for delivery of these assets, appellants were allowed an absolute claim against the estate in the sum of $2,178,300 with interest thereon at six per cent. per annum from May 1, 1932. This claim arose out of a personal guarantee, *Page 240 
by the deceased, of certain bonds issued by the Calaveras Timber Company. The principal assets thus delivered were corporate stock of the Calaveras Timber Company and the Amador Timber Company, both Michigan corporations. The Calaveras company owned some 54,600 acres of timber lands in Calaveras county, California, subject to a mortgage in a sum approximately that stated above and the Amador company owned about 19,400 acres of unincumbered timber lands in Amador county in the same State.
The Ruggles estate owns 998 of the outstanding shares of the Amador company, the two remaining shares were issued to John H. Rademaker and Charles McPherson in order to qualify them as directors, but were indorsed in blank by them and are held by the testamentary trustees.
Rademaker v. Pfeiffer, 259 Mich. 326, having to do with an accounting between Rademaker and Ruggles, mentions these lands. The decree in that cause provides:
"All of the stock of said Ruggles and Rademaker Company and of said Amador Timber Company shall be held by said executors and their successors in trust for the estate of Charles F. Ruggles, deceased, and for said John H. Rademaker, as the respective interests of the estate and said Rademaker may be or appear."
The investment agreement referred to in the Rademaker Case
appears as an exhibit herein and states:
"It is particularly agreed and understood that the rights of the second party (Rademaker) under this agreement shall consist of a personal claim against the said Ruggles, his heirs or assigns, and under no circumstances shall the second party be deemed to have any right, title, or interest, lien, claim or demand, *Page 241 
legal or equitable, of any kind or nature whatsoever in, to, upon or against said lands, timber or other property, or any part thereof," etc.
The testamentary trustees were confronted with the problem of conserving these unincumbered assets belonging to the Amador company which they completely controlled. General business conditions made sales impossible without substantial sacrifices, yet carrying charges for fire protection, taxes, etc., required considerable sums of money even though, under the California moratorium act, delinquent lands may be redeemed within five years after the tax sales. In 1931 $7,500 was borrowed to meet taxes for that year, but no money could be borrowed for the purpose of paying taxes in 1932 and 1933. It was believed by the trustees that the estate's assets were becoming jeopardized and sales made more improbable; the only solution seemed to be to secure financial aid through private sources. A logging contract, a copy of which is shown in the margin hereof,* was entered into on July 25, 1934, between Amador and the E.E. Jackson Lumber Company of *Page 242 
Baltimore, Maryland. Appellees appended the following to this contract over their signatures:
"We approve the foregoing contract and we agree to vote the stock of Amador belonging to the estate of Charles F. Ruggles and constituting more than 99 per cent. of all of the stock of that company, in favor of the execution by said Amador of the above contract." *Page 243 
This contract and the acts of the testamentary trustees in connection therewith furnish the basis of the present controversy.
While it is claimed by appellees that the problem and its proposed solution was submitted to the creditors, appellants say the contract was executed on the same day that their attorneys received knowledge thereof. It is also claimed that informal discussions *Page 244 
were previously had with the probate judge. In any event, formal approval was not sought until the filing of the account herein. Following a recital of facts, appellees say, in their second account:
"We ask the court to approve our action in using our control of said Amador Timber Company to *Page 245 
cause it to enter into said contract and supplemental contract with the E.E. Jackson Lumber Company."
Appellants objected to the allowance of the account, and contend, in substance, that it is the duty of the testamentary trustees to sell the properties of decedent's estate for cash, to such an extent as *Page 246 
may be necessary to pay his debts, and distribute the moneys among the creditors with reasonable promptness; that the testamentary trustees have no authority in law to engage the assets of the estate in a joint venture with the Jackson company; that this venture is a new enterprise, continuing for an indefinite term of years, and is hazardous and speculative in character; that a period of financial panic and depression makes it especially unwise and imprudent to enter into such venture at this time; that the contract is inequitable and unfair to the Ruggles estate because the property of the Amador company is placed in jeopardy thereby, and the Jackson company is secured by lien upon the Amador company's property, and provides that the Amador company must bear both the risk and cost of any possible loss; that nothing can be realized for the creditors of the Ruggles estate out of this valuable tract of timber unless from the uncertain profits of logging and lumbering operations, the risks of which creditors may not, against their will, be compelled to undertake.
Notwithstanding the objections made by creditors, the probate court approved the acts of the trustees *Page 247 
and allowed the account. Appeal was then taken to the circuit court where testimony was received and the probate court order affirmed. The trial judge filed a written opinion from which we quote the following:
"The wisdom or folly of the contract, in the absence of fraud, mistake or palpable abuse of honest discretion, is not for the court. I find none of these elements here present, therefore, the court will not interpose its judgment for that of the trustees, stockholders and directors of the Amador Timber Company, but, will rather base decision upon the legal right of testamentary trustees to make and enter into such a contract. * * *
"The powers of the testamentary trustees under the will, under the decree of court and as stockholders and directors of the Amador Timber Company were very broad. The exigency was imperative in the judgment of the trustees whose integrity and integrity of purpose we are unable to impugn. The contract was made to meet an emergency and had the sanction of the probate court which was later attested by order of confirmation."
The will gives the trustees certain powers over the corpus of the trust, viz.:
"(a) To take possession of, care for, manage and control the same; to pay all taxes, insurance, repairs and other necessary expenses and its reasonable charges and expenses for the proper care, maintenance and management of this trust estate.
"(b) To sell and convey and convert into money any part or all thereof as they in their discretion shall deem for the best interest of my estate and the beneficiaries of this trust, and to invest and reinvest any moneys of which I may die possessed or the proceeds of any sales, in such income-producing securities or properties as in their judgment they shall deem proper, hereby giving to my said trustees for *Page 248 
such purpose all of the authority and power I would possess if living.
"(c) I direct my said trustees to carry out to complete performance and liquidation all of my contracts with the various persons and their assignees who at the time of my death shall have contracts with me entitling them to receive a portion of the proceeds of timber or other property under my control, and I authorize and direct my said trustees to use all or any part of my estate in carrying, developing and disposing [of] said property until such contracts shall be fully performed and liquidated, so that those who have contracts with me shall not suffer needless injury or damage because of my death."
The will also says:
"(h) Because of my belief that it is not wise to limit the discretion of trustees whose decisions may be greatly affected by changing conditions, I have not attempted to limit the discretion of the trustees, and it is my intention that the decisions of the trustees made in the exercise of their discretion in all matters affecting the administration of the trust shall be final, and that no trustee shall be personally liable to my estate or to said trust, any beneficiary thereof or any other person except for wilful and intentional appropriation of said trust fund or the income thereof to purposes which are neither charitable, benevolent or educational."
In 3 Bogert on Trusts and Trustees, § 572, p. 1817, it is said:
"The executor carrying on a business under authority from the will, the executor or administrator carrying on a business under other proper authority, and a testamentary trustee so denominated by the will and carrying on a business under authority to do so, are treated indiscriminately by the courts under *Page 249 
the terms 'trustee,' 'testamentary trustee,' 'executor with an express trust annexed to the office,' and the like. The substantial identity is well recognized, though the recognition is more often implicit than explicit in the opinions. In the citation of authorities no attention is paid to the difference in nomenclature, which is seen clearly to have to do at most with the mode of appointment, and not at all with the substantial attributes of the trusteeship."
In Marshall Field Co. v. Himelstein, 253 Mich. 355, we said:
"Except by order of the court, direction in a will, or by consent of all the parties interested, an administrator has no authority to continue the business which was being conducted by his intestate when he died. Having no such authority, it is his duty to liquidate the estate without undue delay.Swaine v. Hemphill, 165 Mich. 561 (40 L.R.A.. [N. S.] 201)."
The trustees did not secure the consent of the creditors of the estate to enter into the agreement nor did they obtain a court order authorizing them to vote the stock of the Amador company for the purpose of ratifying the Jackson contract; they merely asked the probate court to approve their action after the contract was executed.
Appellees give the following reason, in their brief, for seeking this approval:
"The probate court was not asked to approve the contract, it being a contract between two corporations over which that court had no jurisdiction. The court was asked to approve the action of the trustees in voting the stock of Amador Timber Company to cause it to enter into such a contract, as it was believed that the approval or disapproval by the court of that act of the trustees would be conclusive as to *Page 250 
any personal liability of the trustees or their bondsman for their action in committing the interest of the estate in the capital stock of Amador Timber Company to the approval and ratification of that contract."
If such action by the trustees with respect to the Jackson contract is in furtherance of the operation of a business conducted by the testator in his lifetime, then such power, in absence of the consent required by Swaine v. Hemphill,165 Mich. 561 (40 L.R.A. [N. S.] 201), must be found either in the will or a judicial order. The testator in subdivision (c) directed his trustees to completely perform and liquidate those contracts which were in existence at the time of his death. His contingent obligations under the Calaveras contract of guaranty became a direct obligation of his estate when the claim of the appealing creditors was allowed. The nature of his obligations to Rademaker, by the terms of the decree heretofore quoted, had already become fixed. The Jackson contract, of course, was not in existence at the time of his death. Nevertheless, appellees argue that the Jackson contract is authorized by the directed powers of subdivision (c). This argument would be more effective were it not for the present rights of the objecting creditors of the estate.
The unappealed probate court order of August 12, 1932, for the conditional delivery of the assets of the estate to the testamentary trustees fixed the rights of the parties as to the allowed claim and also limited the testamentary power of the trustees in their management and control of the assets of the estate. We quote from this order:
"It appearing to the court that under the provisions of the will of the testator it will not be lawfully possible for the trustees, in the execution of the *Page 251 
trusts created by said will, to devote any part of the estate to the payment of legacies or bequests until the contracts made by the testator with persons having contracts entitling them to participate in the proceeds of the stock of the Calaveras Timber Company have been fully performed and liquidated; and that the trustees in the execution of the trusts created by said will are authorized to use all or any part of the estate in carrying, developing and disposing of said property until such contracts shall be fully performed and liquidated, and that it will be the duty of the trustees to devote the entire estate, if necessary, to the performance of the obligations which are the basis for the contingent claims heretofore filed herein," etc.
The order from which we have quoted then recites the claim of the Calaveras bondholders and its allowance as an absolute claim with certain provisos as to payment.
Appellants' principal argument is that the Jackson contract indefinitely defers the possibility of payment of their claim. Some confirmation of this apprehension is found in appellees' brief which says:
"The Amador company's timber holdings include nearly 20,000 acres, estimated to contain 220,000,000 feet of yellow pine, 112,000,000 feet of sugar pine, 140,000,000 feet of Douglas and white fir and 54,000,000 feet of incense cedar, comprising a total of 526,000,000 feet of timber. At present the fir has little, if any stumpage value, and in the usual course of operation, will probably not be cut, the present contemplated operation being confined to the pine. A semiportable mill with an annual capacity of 25,000,000 feet, as contemplated, would therefore be able to operate on the pine timber alone for a period of 13 years." *Page 252 
Appellees argue that since the estate's creditors can only be paid by the sale of the Amador stock at a sacrifice, the Jackson contract offers the following advantages:
"(1) It will insure against entire destruction of the value of the stock through ultimate loss of all the corporate properties resulting from the corporation's inability to provide carrying charges for its timber.
"(2) It will be likely to give the Amador stock a substantial sale value, where at present it is unsalable, and may so remain until the title to the timber has been lost.
"(3) It will be likely to produce large ultimate realization of the value of the stock through distribution to the stockholders of the net proceeds of the lumber after the Jackson investment has been returned.
"(4) In case the operation proves unprofitable there would be no incentive to the Jacksons to continue under the contract, and upon election of the Jacksons to abandon the contract, the trustees will have three years from the date of such abandonment in which to make arrangements for some other disposition of the property and the return of the Jackson investment.
"(5) It is the only contract which the trustees have been able to negotiate which will insure the preservation of title to the properties in the corporation and render probable a substantial value to the estate's interest in the stock."
In Frey v. Eisenhardt, 116 Mich. 160, 168, this court held:
"An administrator is not justified in placing or leaving assets in trade, for this is a hazardous use to permit of trust moneys; besides which, trading *Page 253 
lies outside the proper scope of administration functions."
In Ward v. Tinkham, 65 Mich. 695, it is said:
"He (an administrator) has no authority to convert the assets to his private use, or speculate with the moneys of the estate, nor invest them in trade or manufacturing business, either upon his own account or that of the estate. To employ trust funds in trade or in manufacture on the administrator's own responsibility has always been regarded as a breach of trust, and lies outside of the proper scope of administration functions."
See, also, Swaine v. Hemphill, supra, and annotations in 40 L.R.A. (N.S.) 201.
Appellants contend that the appellees' control of over 99 per cent. of the Amador stock is such that they may under proper circumstances be ordered to dissolve the corporation and liquidate its assets for the benefit of the estate. Appellees answer that appellants' theory cannot be justified unless we entirely disregard the corporate entity of the Amador Timber Company and hold that the title to its lands is actually vested in the Ruggles estate. These questions are not before us, because of the limitations placed upon this appeal by the agreement of the parties. We quote from the record:
"It was stated in open court by the attorneys for the appellants and for the appellees that the cause was before the circuit court on appeal from that portion of the order of the probate court which approved the execution of the contract between Amador Timber Company and the E. E. Jackson Lumber Company as said contract was reported by the appellees in their second annual account to the probate court as trustees under the will of Charles F. Ruggles, *Page 254 
deceased, and that that constituted the sole issue on appeal."
A testamentary grant of unlimited discretion with broad powers is not a substitute for explicit direction. Mr. Justice Story in Burwell v. Cawood, 2 How. (43 U.S.) 560, discussed the will of Mandeville which contained this language:
"It is my will that my interest in the copartnership subsisting between Daniel Cawood and myself, under the firm of Daniel Cawood Company, shall be continued therein until the expiration of the term limited by the articles between us," etc.
The learned justice in holding that the general assets in the hands of Mandeville's executor were not liable for the debts of the partnership, remarked, p. 577:
"That nothing but the most clear and unambiguous language, demonstrating in the most positive manner that the testator intends to make his general assets liable for all debts contracted in the continued trade after his death, and not merely to limit it to the funds embarked in that trade, would justify the court in arriving at such a conclusion from the manifest inconvenience thereof, and the utter impossibility of paying off the legacies bequeathed by the testator's will, or distributing the residue of his estate, without in effect saying at the same time that the payments may all be recalled, if the trade should become unsuccessful or ruinous. Such a result would ordinarily be at war with the testator's intention in bequeathing such legacies and residue, and would, or might postpone the settlement of the estate for a half century, or until long after the trade or continued partnership should terminate."
In the instant case, the trustees are empowered to care for, manage, control, sell, convey, convert, invest *Page 255 
and reinvest, etc., "hereby giving * * * for such purposes all of the authority and power I would possess if living." Paragraph (c) contains directions
"To carry out to complete performance and liquidation all of my contracts with the various persons and their assignees who at the time of my death shall have contracts with me entitling them to receive a portion of the proceeds of timber or other property under my control, and I authorize and direct my said trustees to use all or any part of my estate in carrying, developing and disposing [of] said property until such contracts shall be fully performed and liquidated, so that those who have contracts with me shall not suffer needless injury or damage because of my death."
In the will before us, the testator did not explicitly direct his trustees, in unequivocal language, to exercise their stock control over the affairs of the Amador company in such manner as to continue its operation to the exclusion of his creditors.
"The creditors are not bound, without their consent, by any provisions contained in a will for the establishment or continuance of any business after the death of the testator; but they have the absolute right to have the estate applied, as soon as the forms of law will permit, upon their debts. So here, unless the creditors existing at the death of Mrs. Sharp in some way consented to the carrying on of the business by the executor, they have the right to insist that the estate, as it existed at her death, shall be used for the payment of their debts and the expenses of administration to the exclusion of debts subsequently created by the executor. Stanwood v. Owen, 14 Gray (80 Mass.), 195; Pitkin v. Pitkin, 7 Conn. 307 (18 Am. Dec. 111)." Willis v. Sharp, 115 N.Y. 396 (22 N.E. 149, 5 L.R.A. 636). *Page 256 
In a former review of the Willis Case, the New York court of appeals said:
"The intention of a testator to confer upon an executor power to continue a trade must be found in the direct, explicit and unequivocal language of the will or else it will not be deemed to have been conferred. (Burwell v. Cawood, 2 How. [43 U.S.] 560; Kirkman v. Booth, 11 Beav. 273 [18 L. J. Ch. 25, 50 Eng. Rep. 821].)" Willis v. Sharp, 113 N.Y. 586, 590
(21 N.E. 705, 4 L.R.A. 493).
It may be extremely unfortunate if the principal asset of the estate, uncut timber, or the capital stock of the corporation holding the legal title thereto, should be sacrificed in an unfavorable market, but that question is not before us. The reasonableness of the creditors of the estate and those who are responsible for the execution of the testamentary trust will undoubtedly bring about the desired result of conserving the estate's assets for the ultimate and maximum benefits of all concerned. In any event, we realize that such observations are beside the point.
In 3 Bogert's Trusts and Trustees, § 575, p. 1821, it is said:
"It is clear, further, that a decedent cannot, by directing his executor to carry on his business, make his business assets unavailable to his creditors, who are entitled to have their claims against him paid in due course of administration, and, if necessary, to have his assets exhausted for the purpose. If a personal representative continues the decedent's business and the assets of the decedent prove inadequate to meet the decedent's creditors' claims, such creditors can in equity or by administration order compel the representative to realize upon this asset. This is true quite independently of the question (lying between the representative and the distributees) *Page 257 
whether the continuing of the business is proper. Thus, the creditors of the decedent have, so to speak, a priority of claim upon the assets of the decedent which are in the business at the time of his death, as well as upon the general assets, whether or not they are later embarked in the business."
See, Willis v. Sharp, supra; 11 R. C. L. p. 141, and 7 British Ruling Cases, pp. 523, 524, and note.
Appellants' arguments indicate that they object to the logging contract because they insist upon early payments on their absolute claim. A consideration of the provisions of the Jackson contract shows that it imposes a lien upon the unincumbered property of the Amador company and that the corporation is required to share the losses of the logging venture, etc.
Creditors of an estate are entitled by law to the payment of their allowed claims by a liquidation, if necessary, of the assets of the estate. 3 Comp. Laws 1929, § 15553. It seems to be undisputed that the contract before us, if carried out, will result in many years of logging operations, and perhaps preclude the possibility of an early liquidation of Amador's assets for the benefit of the creditors and the beneficiaries of the trust. Such contracts are necessarily speculative, hazardous and unusual in their nature; no one can foresee with any degree of accuracy their vices or virtues; they may eventually prove to be either good or bad, but the authority for them, in the absence of the consent of all interested parties, must be found in the explicit powers of the testamentary trustees or an order of court. Such powers are not granted by the provisions of the will of the deceased.
The objections of appellants to the trustees' second annual account and petition are allowed; the order of approval and allowance is modified by the *Page 258 
vacation of that portion of the probate court's order which approved the action of the said trustees in exercising their control of the capital stock of Amador Timber Company, etc. As so modified, the orders of the probate and circuit courts are affirmed, with costs to appellants.
NORTH, C.J., and FEAD, WIEST, BUTZEL, EDWARD M. SHARPE, POTTER, and Toy, JJ., concurred.
* "This agreement, made this 25th day of July, 1934, by and between the E.E. Jackson Lumber Company, a Maryland corporation, hereinafter sometimes called 'Jackson,' party of the first part, and Amador Timber Company, a Michigan corporation, hereinafter sometimes called 'Amador,' party of the second part.
"Amador represents:
"(a) That it owns (in fee simple and/or timber rights on) 17,491.79 acres of land in Amador county and 1907 acres of land in Eldorado county, California, the timber rights being without expiration and the said ownership being subject to certain grazing rights, a list of said lands and timber rights being attached hereto marked 'Exhibit AA' and made a part hereof, said lands and timber rights constituting all of the same owned by Amador; also the so-called Martell yard, consisting of 4.33 acres in the southwest 1/4 of section 17, town 6 north, range 11 east, together with the improvements thereon;
"(b) That it owes certain moneys for taxes, the cost of fire protection and for other purposes;
"(c) That it has no outstanding contracts of any nature or kind except what is known as the W.G. Snyder contract, dated the 10th day of April, 1933, covering 333.21 acres (timber rights) in Amador county, all rights of Amador under the said contract, it being understood, are included in this agreement.
"Amador has not sufficient working capital or the experience required to cut and to market the timber so owned by it: Jackson has such capital and experience.
"For good and valuable consideration, the parties agree respectively, as follows:
"1. Jackson agrees to promptly make or cause to be made such examinations of the said holdings of Amador and of its title thereto as it shall deem requisite, for the purpose of establishing the quantity and extent of said holdings and the title of the same in Amador free of all liens and incumbrances or claims of any kind and the nonexistence of any outstanding contracts or claims to which it is a party, except the aforesaid Snyder contract. The expenses of such examination shall be considered advances by Jackson, if made, as hereinafter set out, and be treated as such.
"2. Provided that Jackson is satisfied, in its sole discretion, after such examination, of the desirability of proceeding in the matter, it will forthwith upon being secured, as hereinafter provided for, advance the moneys required to pay the 1932 and the 1933 taxes on the property and the 1934 taxes thereon, when fixed, the cost of fire protection of the property, bank indebtedness of Amador approximating $8,000 and any other charge that might be a lien on the property, and to pay to the estate of Charles F. Ruggles the difference between the amounts so paid and the sum of $50,000, the said sum of $50,000 being the maximum amount to be advanced under the provisions of this section.
"3. Thereafter, when, as and if, in the opinion of Jackson, it is profitable or advantageous so to do, and its opinion shall be conclusive, it will cause to be erected as a part of the enterprise, a mill at such location on the property as it deems advisable, and at the same time will cause to be erected at such point as it shall deem advisable a planing mill requisite to handle the lumber so to be cut; from time to time, as Jackson in its uncontrolled discretion deems it profitable and advantageous so to do, it will supplement such saw mill and planing mill by enlarging the same or erecting other similar plants also for the account of the enterprise; and when and so long as it deems it advisable so to do, it will cut the timber and operate the said plant or plants; its judgment shall be conclusive as to when any one or more plants is to be erected and whether and to what extent timber shall be cut and/or the plant or plants shall be operated; all payments made pursuant to this section shall be deemed to be advances, to be repaid as provided in section 7 hereof.
"4. After Jackson shall have made the initial advances contemplated by section 2 hereof, it will continue to pay the taxes on the property and the cost of protecting the same against fire so long as this contract remains in existence; payments so made, as well as the initial payments aggregating $50,000, to be advanced under this contract, if advanced, to be repaid as provided in section 7 hereof.
"5. Jackson shall have a first lien in such form as its counsel shall advise, on all the land and timber owned as aforesaid by Amador, on all mills and plants and the equipment thereof on the property covered by this contract now owned or hereafter acquired, or located elsewhere if erected by Jackson or Amador and on any property hereafter acquired by Amador or acquired by Jackson for the enterprise as contemplated by section 9 hereof, all as security for the repayment to it of all moneys which it shall have advanced pursuant to this contract, with right to sell the property in satisfaction of the lien at any time, on 36 months' notice.
"6. Jackson will use its best efforts to sell the lumber produced from the timber, on the best terms that it is able to dispose of it.
"7. All cost of operation and of selling, all losses, carrying charges and like items incident to the manufacture and sale of the timber (hereinafter generally referred to as 'costs'), together with interest at the rate of six per cent. per annum on the amount of the advances by Jackson, shall first be deducted from the amounts realized from the sale of the lumber or logs manufactured from the timber, and any further realizations therefrom shall be used to repay the advances of Jackson with interest at six per cent. After the same shall have been paid, with interest as aforesaid, all further realizations from land, timber, mills, equipment, inventory, accounts, cash, etc., shall be divided equally between Jackson and Amador after the retention of what, at the discretion of Jackson, is advisable for working capital and the operation of the business. It is agreed that until payments to Amador shall have commenced to accrue, the president of Jackson and its vice-president and treasurer shall receive salaries of not more than $2,000 per annum, a total of $4,000 for the three offices, and that after said payments to Amador shall have commenced to accrue, said amounts shall be increased to sums not in excess of $5,000 for the president and a like amount for the vice-president and treasurer, a total of $10,000 for the incumbents of said three offices; Provided, however, that after said payments to Amador shall have commenced to accrue, the said salaries for the president and for the vice-president and treasurer, if in excess of a total of $4,000, shall not exceed an amount equal to 20 per cent. of the gross amount of realizations apportionable to Amador.
"8. No sale of the timber shall be made by Amador without the consent of Jackson, and if any timber be sold with such consent, the proceeds shall be applied first to the repayment to Jackson of all of its advances with interest at six per cent. per annum and costs, and the balance shall be divided equally between Jackson and Amador; Provided, however, that this restriction shall not affect in any way the right of Jackson to cause the timber to be sold in satisfaction of its lien on 36 months' notice, if its advances be not repaid to it. In the event of such sale in satisfaction of lien, Amador agrees to join in any deed to the purchaser thereof.
"9. While this contract is in force, it is agreed that Jackson may buy additional timber (in fee or timber rights). The cost shall be deemed an advance under this contract, and the realization from the purchase shall be treated in the same manner as any other realization from any other property included within the terms of this contract.
"Amador shall not, however, while this contract is in force, make any purchase of timber or timber rights except with the consent of Jackson. If any purchase be made with such consent, the property purchased shall be treated as if owned by Amador as of the date hereof.
"10. Jackson will furnish to Amador within 90 days from the close of each fiscal year of Jackson, certified audit of its books, including a profit and loss statement for the preceding fiscal year and the balance sheet as of the close of said year; and Amador shall have the right through accountants designated by it or through its officers, to check the books of Jackson dealing with the enterprise contemplated by this contract at such reasonable times as it may desire. If such check verifies the correctness of the balance sheets and profit and loss statements given by Jackson to Amador, the expense thereof shall be borne by Amador; otherwise, by Jackson.
"11. Jackson shall have the right to terminate this contract at any time on 36 months' notice, and on such termination all advances with interest at the rate of six per cent. per annum, and costs not heretofore paid, shall be repayable to it; if not repaid, the property may be sold in satisfaction of the lien.
"12. In the event that no saw mill be erected on the property by Jackson within three years from the date hereof, this contract shall at the option of Amador terminate. No such termination, however, shall relieve Amador from the obligation of repaying the advances theretofore made, with interest as aforesaid, or affect the lien of Jackson for the repayment of the same.
"13. This contract may be assigned by Jackson to another corporation having not less financial responsibility than Jackson, and in which both E.E. Jackson and R.N. Jackson, if living, shall be substantially interested.
"In witness whereof, the parties hereto have caused this agreement to be signed in duplicate by their proper officers and their respective corporate seals to be hereunto affixed and to be duly attested, all on the day and year first above written.
"Executed in duplicate.
 "The E. E. JACKSON LUMBER COMPANY, "By E. E. JACKSON, JR., President.
"Attest:
 "M. TOOR, "Secretary.
 "AMADOR TIMBER COMPANY, "By CHARLES McPHERSON, President.
"Attest:
 "EWALD J. PFEIFFER, "Secretary.
"This supplemental agreement, made this 25th day of July, 1934, by and between The Jackson Lumber Company, a Maryland corporation, hereinafter sometimes called 'Jackson,' party of the first part, and Amador Timber Company, a Michigan corporation, hereinafter sometimes called 'Amador,' party of the second part.
"This contract is supplemental to and is made as a part of an agreement bearing the same date between the same parties, to correct and/or to change certain provisions of said original contract.
"For valuable consideration, the parties agree that said contract shall be supplemental and amended as follows, viz.:
"(a) by omitting from page 1, the words 'Jackson has such capital and experience' and inserting in lieu thereof, the words 'Jackson has lumber manufacturing experience and commands such capital;'
"(b) by adding to paragraph 7, the following:
" 'Inasmuch as, at this time, the method of operation and of accounting cannot be definitely determined upon and inasmuch as at this time, it is not known whether the operation will be by Jackson or by another corporation, it is agreed that in addition to the amount to be retained by it or to be paid to it, under the contract, Jackson shall be entitled (the same to be treated in the same manner as an advance), to any moneys paid by it by way of taxes, including income taxes, State and/or Federal, on any property which may ultimately belong to Amador.'
"In witness whereof, the parties hereto have caused this supplemental agreement to be signed in duplicate by their proper officers and their respective corporate seals to be hereunto affixed and to be duly attested, all on the day and year first above written.
"Executed in duplicate.
 "The E. E. JACKSON LUMBER COMPANY "By E. E. JACKSON, JR., President.
"Attest:
 "M. TOOR, "Secretary.
 "AMADOR TIMBER COMPANY "By CHARLES McPHERSON, President.
"Attest:
 "EWALD J. PFEIFFER, "Secretary."